It is my pleasure of welcoming United States District Judge James B. Zagel from the United States District Court for the Northern District of Illinois, a very experienced and able district judge who is here to help us. We benefit from having district judges sit with us and not only on the assistance with our caseload but also the experience of being a trial judge. For those of us who have our experience limited to appellate judging, it's a wonderful addition to our experience and exposure to a different perspective and I think it will be a benefit both to us and to counsel. Very well, so welcome Judge Zagel. Thank you. We have three cases on for argument today. The first one is Medical Solutions v. C Change, number 2007-1163. Mr. Moran. Good morning, your honors. My name is John Moran. I'm here on behalf of Medical Solutions, Inc. or MSI. The District Court of the District of Columbia has personal jurisdiction over the appellate C Change in this case because of C Change's presence here in D.C. and its use of the infringing article here in D.C. Three points support personal jurisdiction based on those facts. First, since personal jurisdiction discovery did not take place in this case, MSI need only make a prima facie case of personal jurisdiction to the court. And all factual inferences are to be resolved in MSI's favor. The District Court in this case applied its own law rather than the Federal Circuit law and it's not clear that the facts were resolved in our favor. The second point that supports personal jurisdiction based on the presence and the use in the D.C. of the infringing product is the statute, 35 U.S.C. 271. By its plain language, provides the patentee with the exclusive right to use the patented invention. Well, you've mentioned now a number of times the word use. So I'm interested in the record and what you presented to the District Court with respect to the actual use of the accused device in D.C. Two points, Your Honor. First, we need only make allegations of the use of the infringing article here. In addition to that, we provided to the District Court to the extent that the use was demonstrated, for example, I would refer the court to the joint appendix 177 showing one of the articles in use. It shows that the article has a solution in it. It shows the syringe for dispensing it, which would be used for a patient. It shows the sterile blanket over the device. Another example of use at the trade show would be also appendix page 154. In that picture, you can also see in the central area, once again, the blue drape. The orange or the purple ball above that blue drape is, in layman's terms, basically a medical version of a turkey baster. The solution is taken out of the bowl and applied to the solution. What's going on in these pictures? Is the machine functioning here or are they merely displaying the way the machine looks if you take it out of the box? It is our understanding, based on our employees visiting the show and viewing these photographs, that it's actually being used. Where did you say that to the District Court? In the declaration of Mr. Cordell, where he talked about, which is appendix pages 169 through 173. Specifically, again, where does he describe exactly what's going on? In paragraph 10, he talks about that he was told at the ARN meeting, who was demonstrating the equipment that was similar to medical equipment. Demonstrating equipment is pretty vague. If I show you a device, I could be said to be demonstrating the device, but I could also be said simply to be displaying the device. Is there anything more specific that would distinguish between simply displaying the device and using the device in the sense that you are operating the device in the manner that it is intended to be operated? Well, you raise a number of issues in that question. Starting from the last one first, the manner in which the devices intend to operate goes to basically what is the claimed invention. At the time of discovery, or at the time of complaint being filed and jurisdictional allegations being made, the claims have not yet been interpreted, nor has the infringement analysis been made by the court. The question of what is its intended purpose is not before the court at that particular time. Or if it is, then that basically collapses upon the district court judge, the markman, to find out what the claim says, what is its intended use, is there a preamble, is there a preamble, a field of use, or an intended use limitation? Who is the beneficiary of these? When you focus the question, what's the intended use, the use of what? The answer is the use of the patented invention. Well, here's my problem, so maybe I can sort of, I kind of hear what you're saying, but it's going a little past me. The language you pointed Judge Bryson to in paragraph 10, all that seems to say to me is, I heard by word of mouth that there was someone there who was demonstrating equipment. I mean, even giving that an inference, I mean, are you asking that we conclude or that this demonstrated to the district court that someone was actually demonstrating it? I mean, all this says is I heard by word of mouth that there was someone demonstrating it. It doesn't prove in any way, shape, or form, in my view, that he was demonstrating it. And just to finish the question, and then you can respond, the only thing I see, and you cite in your briefs paragraphs 10 through 16, the closest I thought the language in those paragraphs came was in paragraph 15, where it says he showed me how you could take the basin off the device. But aside from taking the basin off the device, I don't see anything in the record that you've shown us that goes to the actual use. Well, the photographs do show the actual use, although I cannot tell, we could not tell from this presence at the trade show if the LEDs were on because they were covered up by the blanket. But if you can see, for example, in appendix 154. So do you agree with me in terms of my reading of the paragraphs in the declaration that I've cited, paragraphs 10 through 16? Because your answer seemed to be, well, there are these photographs. No, no. That together, basically, when he is told that somebody is demonstrating it, and this goes back to your question, Judge Bryson, is there any difference between displaying and demonstrating, and holding it up and saying, here it is, is basically showing you the cup, but that's it, rather than showing how it's used. So there is a difference between, first of all, the vocabulary, displaying, and the word demonstrating, I would suggest. And that's been a point of contention in many cases before, and the courts have focused on one being a passive act and the other one being an action, demonstrating actually doing things. Well, but the demonstration would be the holding it up. I mean, I'm not sure that trying to parse the words that finally is really fair to the district judge if you don't describe, in more specific terms, exactly what's going on. Well, one is use, and one is showing. So there is a difference in the actual activities that are going on. One is simply the BlackBerry is on the tabletop, for example, versus pushing the buttons and saying, hey, look what happens, you can get internet access. That's demonstration versus display. So I suggest that there is a difference, and the difference is that one is an active and one is a passive activity, and the active activity of demonstrating gives rise to use. But both of these devices, yours and the defendant's device, are supposed to control the temperature of fluids in an operating room. Is it conceivable that one could actually use either device in any meaningful way in the floor of a trade show? Absolutely, because your question goes to two points. One is, what is being used? And as I explained earlier, it's the claimed invention. The claimed invention at the time of jurisdiction has not been established by district court yet. The meanings of the terms, what are the limitations, is there an intended use limitation? However, in the facts of this particular case, the claims, for example, which are part of the record, do not have limitations on intended use at a hospital in a surgical environment. Even more so, if you look, for example, at the picture on A154, there shows in the lower right-hand corner of the device, just below the drape, you can see that there are, it's not really clear since you don't really know what the pictures show, but if you look just below the drape, and what perhaps is a bag that the woman is holding there, there is what appears to be a bottle or a container inside of its heating chamber. Below the drape is the non-sterile environment. It's the whole point of the drape is to delineate between the upper portion, which is sterile, and the lower portion, which is non-sterile. The heating of the object, or as the claim talks about, and the claim was not before the district court, but heating of that object is in a non-sterile environment and can be fully operated on the floor of a trade show. So the answer to your question is yes, and the picture shows a device having an item inside one of the heating chambers, which is a subject matter of the patents. But couldn't the district judge also consider the fact that, when you were arguing that jurisdiction, and there was some question of a sale being made as a consequence of what they did in the District of Columbia, there was a sale in Maryland and I guess one other place, who were those sales made to? Hospitals. Hospitals. Yes. And you think that the judge could not make a reasonable inference as to the demonstration between a hospital and a trade show? Well, the pictures talk about the devices were being demonstrated to customers. You have to bear in mind that MSI did not take these pictures, nor did they provide the captions. These are seat changes captions. But the photograph on A177, the caption is, provide valuable customer feedback. So they call them customers. The on sale issue is not before the court at the present time, but the answer to your question is yes, the court could look at and see these people are customers. But for trying to answer your question, Judge Rice, and your question, Judge Prost, the issue of what evidence of use is there, the answer is the photographs coupled with the information that the MSI employee could develop on his own. Your sense of concern about that level of detail was also our concern. We had that information. We made the best that we could based on this information, the activity shown there. We also know that there's a fluid in the device there ready to be dispensed, for example. And that's why we asked for jurisdictional discovery to say, okay, was it plugged in? How many people saw it? What did these nurses do? What it does is it warms the fluid. Yeah. Okay, but the photograph that you keep pointing to, the caption there, says what they're showing is how to prepare it for sterile use. That is by putting, for example, the drape over it. The drape doesn't come with the drape. Yeah, but how is preparing for sterile use using the invention for its intended purpose? Well, Your Honor, first of all, the phrase of using the invention for its intended purpose is not something that was considered by the district court. There's no evidence on record of what the intended purpose is. Okay, but how is it using the invention when you're preparing it for use? Because you can see, coupled with the observations of the employee and what he was told, you can see that the device has a bottle in the warmer for warming, and that's just below the curtain on A154 for warming. And in the other picture on A177, you can see that there's fluid in there. The fluid is in the bowl. The bowl is on top of the warmer. I can't see that there's fluid in there, but I'll take your assertion. If you look at the bowl on A177, the upper portion of the bowl around the purple ball is a lighter color than the lower portion of the bowl, which is darker. I'll take your word for it. So that is what we have at the present time. Observations and photographs which put together show that they were using this equipment on the floor of the trade show. I have the same problem as Judge Prosser. Of course, we're discussing a really small distinction here, maybe, in the way the words are used. But you used the example of the BlackBerry. If I were to take out my BlackBerry, not turn it on, but demonstrate to you how easy it is to push the buttons, and I push three or four of the buttons. Now, the BlackBerry is not on, but I'm demonstrating that the keyboard is easy to use. I'm demonstrating the use of the BlackBerry, but am I using the BlackBerry? Well, two points in response. First, it goes back to my original point of use of what. What are the claims? In the example of the BlackBerry, we'll assume that the claims are to a system, and all you're showing is the user interface here at the keyboard. Alternatively, if the claims were to a keyboard layout, then you were doing what you were doing. Clearly, you would be using it because you were showing exactly what you said, the ease of it. I believe you meant, for example, where it was operational just as in a normal BlackBerry. In that sense, no, because the system is not turned on. You're not actually having control over it at that point in time. You're simply displaying it. But I am demonstrating how it would be used. No, because you're not. You're showing how you could touch the keypad, but you have not been able to use it functionally to send a message or receive a message. For the purpose that it was intended to be used. Or even to see how clear the screen was without your glasses, for example. So all you're doing is displaying it and fiddling around with it, I would say, in non-legal terms. Displaying and fiddling around. Yes, but not demonstrating, because demonstrating takes an action, takes the device and actually uses it. Well, if I put it down on a stack of papers, I would be using it in a rough sense as a paperweight, but I wouldn't be using it for the purpose it was intended to be used for. Exactly. So is that the test? No, it's not. All right. Well, then why is the paperweight use not a sufficient use the way you're pitching the use? Because we would not allege it being in a paperweight. Of course not. That's a silly example. Yes. But why is it materially different from demonstration at a trade show where this is not hooked up in the context in which it is intended to be used? Well, you assume that there is a context in which it is to be used. Yes. That is an assumption that was not before the district court and depends upon claim interpretation. Okay. It depends upon Markman. All right. So I think we have your case, and we'll restore your roll in time. We've asked you a lot of questions. Very well. Let's see. Ms. Deem, you have 15 minutes. Good morning. May it please the court, I am Tanya Deem with King Patrick Stockton here on behalf of Appley Seachange Surgical. The district court of D.C. properly granted Seachange's motion to dismiss for lack of personal jurisdiction. Under the District of Columbia long-arm statute, MSI had to make a prima facie showing that Seachange caused a tortuous injury in D.C. In the lower court, MSI argued that Seachange's display, an arguable demonstration of a prototype of the alleged infringing product, constituted both an offer of sale and a use under Section 271A. Is it your view that in order to have a use to be covered, that it can only occur when it's intended in the hospital context where it's used by its intended end users? I mean, something in your brief suggested that to me, that you were defining use to be that limited. With respect to the specific product at issue in this case, we believe that use is defined based on the intended purpose of the product. And the intended purpose of this product, as set forth in the objects and the patents, and also in the briefs and the papers submitted by MSI, is that it is a product which warms medical fluids and medical equipment in a sterile environment, such as a surgery. So in this context, yes, I don't believe, as you all examined MSI in their opening argument, that merely warming fluids in a trade show would be a use, even if the machine were on. I believe it would need to be in a sterile environment, such as in a surgery. So that no matter what they did at a trade show or outside of a surgery room in a medical facility, you could never have use? With respect to this product, yes, that's our position. What do you make of the drawings that the other side pointed to? In the first drawing, the caption says, preparing for sterile use. Leaving aside your view of how narrow or how broad use is, did they meet any standard of use? Let's assume we disagree with you, for instance, that if you entirely use this as intended by the patent, it doesn't necessarily have to be in a particular environment. Right. If you disagree with us, no, we still disagree with their position. And that preparing the instrument for use is not the same thing as use. And as you all pointed out in your questioning to MSI, the evidence in the record, which was submitted by their sales representative, a professional product demonstrator, Mr. Cordell, who happened to be at the AORN conference for three days, each of the three days, who discussed the C-Change booth with conference attendees, who observed the C-Change booth and C-Change's interactions with conference attendees, who inspected the product and discussed the product with C-Change's representative, didn't provide any information in his declaration that the machine was on or warming fluids. What he said in his declaration was that the C-Change representative described to him how the unit would warm medical fluids in a sterile setting. He discussed with him the advantages of the product. And he demonstrated, as you pointed out, Judge Prost, how you would remove the basin. There was no evidence in that declaration as to use, as we define use. In arguing that C-Change's demonstration constituted a use, MSI argues that the district court failed to apply a totality of the circumstances test. However, neither the Supreme Court nor this court have adopted the totality of the circumstances test to evaluate use under Section 271A. In fact, the totality of the circumstances test has only been applied in use cases by a handful of lower courts and, for the most part, prior to the 1996 Amendment of the Patent Act, which added offer to sale as a distinct basis for infringement. In analyzing those pre-96 cases, it's clear that the totality of the circumstances test was applied in an attempt to broaden the definition of infringing use in order to capture defendants who had diverted sales or otherwise profited unfairly at the patent owner's expense without actually placing an invention into service. The 96 Amendments, by adding offer to sale, made it therefore unnecessary and inappropriate for lower courts to continue stretching the definition of use to include sales-related activity. But does that distinction matter to the result in this case? It does because here they've argued regarding possible sales that occurred months after the conference and they're also arguing that they are entitled to have or that the district court abused its discretion in denying their motion for discovery, but the discovery that they were seeking in the district court related to sales activity. And sales activity post the 96 Amendments isn't related to how you define use. It might constitute a sale or it might constitute an offer of sale in defining infringement, but it doesn't amount to use. Instead, we look at whether or not the invention has been put into its intended purpose. What does the record here show about the extent of the sales of this device, not in the District of Columbia but in other jurisdictions? There is some allusion to other sales. There is some allusion to other sales and I might point out the MSI has waived its argument as to whether or not there was an offer of sale made in the DC. I understand. But the evidence in the record was that there were two hospitals that purchased the InterTemp or at least received an InterTemp. One was an actual sale and one was just an evaluation of InterTemp. One of those hospitals contacted C-Change after somebody at the hospital heard about the C-Change product from somebody else who happened to have seen it and that contact occurred months after the conference. The other hospital at issue contacted C-Change directly through its website. I forget how many months, but it was three or four or five months after the conference. And those hospitals are located, one of them is in Maryland, is that right? That's correct and the other one is in Georgia. And the evidence in the record, the uncontradicted evidence in the record, was that there was no offer to sale made at the conference. In fact, it was a prototype of the unit that was at the conference. The representatives at the conference had no pricing information. There was no sales information. While attendees were able to leave their contact information at the booth, no follow-up was made with those attendees. C-Change did not go out and solicit those people, did not market those people or otherwise follow up with those people. Is there any evidence in the record as to whether or not the prototype at the trade show lacked any features of the asserted claims? There's not. The evidence is merely that it's a prototype. We don't know what that means, right? We don't know the extent to which it has a... A fully operative prototype or Potemkin Village type prototype? Or do we know? We don't know from the record. Just the word prototype is all we have? We don't know from the record. I mean, I can tell you the answer to the question, but it's not in the record. Well, I think we probably should limit ourselves to the record. We get into trouble. While the scope of activities that can constitute an infringing use of an invention under 271A is broad, it is not boundless. And as the Supreme Court explained in the Bauer decision, to constitute use, the invention must be put into service. And in determining what it means to put an invention into service, this court, treatises and other courts look to the purpose of the invention and that is an invention is used in the sense of an infringement when the accused party has employed the invention for its underlying beneficial purpose or function. So your view is that a demonstration, even if it's entirely complete use of the device, in the demonstration, outside of the context of its normal use, it can never be a use. Is that your view? It's not, actually. I think that you can think of examples where it would be a demonstration and also a use, for example. So it doesn't have to be used for its intended purpose and context. It depends on what the intended purpose is. In this case, the accused product and the invention at issue is technology that warms medical fluids and medical equipment in a sterile environment, such as a surgery. But I can think of a possible product that could be used at a trade show and also demonstrated. For example, suppose you have an invention that involves a new fangled hanger for hanging very heavy objects on a wall and you take that to a trade show and you hang up a large, really heavy, clear glass picture or something that you can see through. In that situation, the hanger would both be used and demonstrated and it would be used for its intended purpose of hanging heavy objects. That's not the situation here. Well, but that example is clearly the use is within the contemplation of the invention as claimed. But this is a silly example, but it's the best I can come up with on the spot. And suppose that Jiffy Lube were to discover that this particular device was very useful for processing oil or something. It turns out that they could use this particular device in their shops and they buy ten dozen of them and they use them. I mean, is that not an infringing use because it's outside of the field of what was contemplated by the patent? Yes, I believe. And our position is that that is not an infringing use because that's not the intended purpose of this piece of equipment as explained in the patents and as explained in the pleadings in the lower court in the briefs in this case. So if it were used not in hospitals for patients, human patients, but instead were used in treating animals, it wouldn't be a use? Treating animals in a sterile environment, it may be. But using it, for example, to warm water to warm up your leftovers from last night would not be an infringing use under our definition of use because that is not for the intended benefit and purpose of the invention. In discussing the evidence that's in the record as to whether or not there was a use or not a use of the invention, I mentioned that the MSI representative was at the conference for three days. He was a professional demonstrator. He observed the booth. He saw the interaction with C-Change and the attendees and he discussed and even inspected the product, but yet there's no evidence in the record submitted by MSI or even an allegation to confront C-Change's uncontradicted affidavits that the invention was used during the conference to warm or control the temperature of medical or surgical fluids in a sterile environment. Simply, the intertemp was not used during the conference for the invention's underlying beneficial purpose or function. Therefore, it was not a use under Section 271A. With respect to jurisdictional discovery, on appeal MSI argues that the district court abused its discretion in not allowing MSI to take discovery into how C-Change actually demonstrated the intertemp at the ARN conference. The district court did not abuse its discretion in denying the motion. MSI failed to meet its burden of showing that discovery was warranted. Moreover, had the requested discovery been granted, it would not have affected the jurisdictional analysis. Jurisdictional discovery is warranted only when the plaintiff has established a prima facie showing of personal jurisdiction or when there are issues of fact that can be resolved through discovery. And there are neither of those instances in this case. Is there other litigation going on between the parties elsewhere? I thought I saw some reference to that. That's a very good point, Judge Gross. There is. There is an action pending in the Middle District of North Carolina. It's a declaratory judgment action filed by C-Change and it's been stayed pending the resolution of the motion to dismiss. So if this court were to... Was that filed before or after? It was filed shortly after this case was filed in the District of Columbia. This case arose with no advance warning. So if this court affirms the District of Columbia's granting of the motion to dismiss, MSI still has recourse and has an opportunity to pursue its claims in North Carolina where C-Change is based and where the intertemp is manufactured and where it can be sold and offered for sale. In this case, even when all the factual allegations are assumed true and all the inferences are construed in the light most favorable to MSI, MSI is still unable to establish a prima facie showing of personal jurisdiction because C-Change's display and arguable demonstration of the prototype would not constitute an infringing use under 271A. There's nothing in the record to suggest that the intertemp was used during the conference for the invention's underlying beneficial use or purpose. C-Change has presented evidence showing that the invention was not used during the conference and despite the fact that MSI's representative was there and had ample opportunity to inspect and submit evidence in the record, they did not. Jurisdictional discovery is not appropriate when plaintiff merely hopes to find statements in the defendant's affidavits that are not correct but has not made counter allegations in its own affidavit. In light of C-Change's uncontested affidavit, the district court was justified in denying discovery and there was no abuse of discretion. C-Change respectfully requests that this court affirm the district court's dismissal of C-Change for lack of personal jurisdiction. Very well. Thank you, Christine. Mr. Moran, we'll restore your full rebuttal time if you need it. With respect to the quantum of evidence in the record for demonstration or use, two points. One, the legal point is that all factual inferences are resolved in favor of MSI in making its allegations to support personal jurisdiction. We're not in infringement yet, just personal jurisdiction. And in the adjoined appendix, the district court's opinion at A-5, the district court makes a statement that the defendant does not dispute that it demonstrated and provided information to attendees regarding the alleged infringing product. So with respect to the district court, it notes that the defendant doesn't dispute it, so any factual inference with respect to demonstration or use should be resolved in our favor. With respect to infringing use and intended use, who are the beneficiaries of it? While it was not before the district court because we were in the midst of a mark-up proceeding and no claims had been asserted at that time specifically. In the record before the court, our claims, for example, at joint appendix A-44 of one of the patents that sued, the 067 patent, are claims 35 and 36, neither of which have any reference to medical items, sterile items, patients. It could, in your example, Your Honor, with respect to Jiffy Lube, if they did use this device, they would infringe our claims. So that goes back to my point that when you're using this intended use, the beneficiary basically collapses on the district court judge the burden of trying to define what claims mean, who the intended beneficiary, is there an intended use, what is that limitation? So the other patent that sued for another example of claims that are not limited to intended use or beneficiaries, as in the attorney argument before this court, is that A-61, claim 28, also talks about a temperature control system that's not limited to medical items or sterile environment. And that is your question earlier, could this be used on a trade show floor? I respond, it depends upon what the invention is. The answer is yes, it could be, even if it was medical items as other claims showed in the pictures where it was being used, at least as our understanding, to heat the unsterile bottles of fluid that would be provided to a patient. Is your argument that in these circumstances a Markman hearing is antecedent to jurisdiction? If this court adopts the district court's interpretation, or see changes, yes, because how is the district court going to know what the intended use is? What is the invention? Is there a limitation for an intended beneficiary? That is all premature at the jurisdictional stage. Here we have the district court noting that the demonstration existed. We allege that it's of the accused device. We allege that tort has been committed here in the District of Columbia. The genesis of the beneficial use or the intended use is the NTP case, the Blackberry case, where this court did not restrict use, but expanded it to consider factors that would normally have been outside the geographic scope of the United States, where the benefit, where the user, you using your Blackberry, would gain the benefit of the functionality that was occurring outside. So that genesis of this intended use or beneficial use is in that case and doesn't apply here at all because we don't have the facts here. There's no question that the Washington Convention Center is down the street from here. We're in the United States. That's not before the court. If the court were to adopt the demonstration as not jurisdictional establishing, then we basically have infringement-free zones. I mean, as that impinges on our rights as a patentee. One of the rights a patentee has is go to the trade show and demonstrate its product, show its product, use it. And down the street or down a few more boots down, there's an infringer there. Well, as the court said it better than I could, the Supreme Court in Bauer, said that one of the exclusive rights to use is to prevent others from exercising like privileges without the consent of the patentee. And that's why we filed suit. We observed the tort. The district court noted the demonstration was not controverted at the time or hasn't. So the tort occurred here. The defendant was here. And that we submit is sufficient for prima facie personal jurisdiction. Thank you, Mr. Murray. The case is submitted. Thanks to both counsel.